Argued and submitted March 20, reversed in part; otherwise affirmed
June 26, 2003

# LABOR READY NORTHWEST, INC.,
*Petitioner,*

*v.*

# BUREAU OF LABOR AND INDUSTRIES,
*Respondent.*

## 31-01; A116860

71 P3d 559

David J. Sweeney argued the cause for petitioner. With him on the briefs were Paul G. Dodds and Brownstein, Rask, Sweeney, Kerr, Grim, DeSylvia & Hay, LLP.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Petitioner, Labor Ready Northwest, Inc., seeks review of a final order of the Commissioner of the Bureau of Labor and Industries (BOLI) that determined that petitioner had violated prevailing wage laws, assessed civil penalties, ORS 279.370(1), and placed petitioner on the list of those ineligible to receive contracts or subcontracts for public works for a one-year period, ORS 279.361(1). As explained below, we conclude that BOLI erred in determining that petitioner "intentionally" failed to pay or post the prevailing wage rate and, thus, that petitioner was not subject to debarment. We further conclude that BOLI correctly imposed civil penalties based, *inter alia*, on petitioner's failure to "keep" the prevailing wage rate posted at the job site. Consequently, we reverse the imposition of debarment but affirm the imposition of civil penalties.

■ This case involves the application of several provisions of Oregon's prevailing wage rate statutory scheme, ORS 279.348 through 279.380.[1] To place the parties' contentions in context, we begin with a brief overview of that statutory scheme. Under ORS 279.350, all contractors and subcontractors on public works contracts must pay their employees "not less than the prevailing rate of wage for an hour's work in the same trade or occupation in the locality where such labor is performed," ORS 279.350(1), and "keep" those rates "posted in a conspicuous and accessible place in or about the project." ORS 279.350(4). BOLI is responsible for determining the "prevailing rate of wage" based on "the rate of hourly wage * * * paid in the locality to the majority of workers employed on projects of similar character in the same trade or occupation." ORS 279.348(1).

To promote employer compliance, the statutes provide for a three-tiered penalty structure. First, any contractor or subcontractor on a public works contract who pays its

---

[1] Those statutes are commonly referred to as Oregon's "Little Davis-Bacon Act." *Stockton v. Silco Construction Co.*, 319 Or 365, 877 P2d 71 (1994). The Davis-Bacon Act, 40 USC § 276(a) *et seq.*, "is aimed at ensuring that workers on governmental projects are paid at least the prevailing wage in the area in which the project is carried out for the workers' respective crafts." *Stockton*, 319 Or at 368.

employees less than the prevailing wage is "liable to the workers affected in the amount of their unpaid minimum wages * * * and in an additional amount equal to said unpaid wages as liquidated damages." ORS 279.356(1). Second, BOLI is also authorized to "assess a civil penalty not to exceed $5,000 for each violation" of the prevailing wage laws. ORS 279.370(1). Finally, a contractor or subcontractor who has "intentionally failed" to pay or post the prevailing wage rate as required by ORS 279.350 is subject to debarment, *i.e.*, that contractor "shall be ineligible for a period not to exceed three years from the date of publication of the name of the contractor or subcontractor on the ineligible list as provided in this section to receive any contract or subcontract for public works." ORS 279.361(1).

With that backdrop, we return to this dispute. Although the parties dispute the legal significance of some of their actions and dealings as found by BOLI, for purposes of our analysis and disposition, the material facts are, except as specifically noted, undisputed.[2]

Petitioner is in the business of providing temporary workers to other client businesses. On April 3, 2000, a representative from Pro-Tec Fireproofing, a subcontractor on a project to build a new middle school in Bend, telephoned petitioner's Bend office seeking temporary employees. Between April 4 and June 2, 2000, petitioner supplied eight workers to Pro-Tec. Those workers performed two primary duties to assist Pro-Tec employees who were spraying fireproofing material. First, the workers carried bags of dry insulating material to a hopper, cut the bags open, and dumped the materials into the machine, where the dry material was mixed with water before it was sprayed by a Pro-Tec employee onto the project's walls. Second, the workers cleaned up any resultant overspray of fireproofing material.

Because the construction of the new middle school was a public works project, all contractors and subcontractors were governed by the prevailing wage laws. As pertinent here, all the contractors and subcontractors were required to

---

[2] Additional facts pertaining to particular assignments of error are set forth in the discussion of those assignments.

pay their workers the prevailing wage and to "keep" the prevailing wage posted at the job site. ORS 279.350(1), (4). BOLI's January 1999 edition of the prevailing wage book for Deschutes County—the wage book that determined the appropriate wages to be paid to petitioner's employees working on the project—did not contain a specific classification for workers engaged in "fireproofing," or, as applicable to petitioner's employees, for workers assisting those who were engaged in "fireproofing."[3]

Most of the workers that petitioner hires perform unskilled labor for petitioner's clients and are properly classified as "laborers" on prevailing wage rate jobs. Petitioner classified its eight workers assisting Pro-Tec as "laborers." Thus, petitioner paid the eight employees at the rate of $21.59 per hour, the prevailing wage for a "laborer" in the January 1999 prevailing wage book.

With respect to posting of rates, petitioner did not post any prevailing wage rates at the project site. Although some other employer(s) posted prevailing wage rates in the general contractor's job shack, the record does not disclose which specific classification rates were posted.

In April and May 2000, John Rowand, an investigator with the Oregon and Southwest Washington Fair Contracting Foundation, visited the middle school site. After observing Pro-Tec's and petitioner's employees, and after inspecting petitioner's payroll statements for the middle school project, Rowand determined that petitioner had incorrectly classified and, thus, underpaid its workers on the project. Rowand's conclusion was that petitioner's eight employees were properly classified as "tenders to plasterers"[4] instead of as "laborers" and, thus, should have been paid $26.59 an hour—$5.00 more than the $21.59 they had been paid.

---

[3] Before 1997, BOLI utilized the federal Davis-Bacon prevailing wage rates. In 1997, BOLI began to conduct its own annual wage surveys and, since February 1998, it has published its own prevailing wage rate booklets for state public works projects.

[4] "Tenders" refers to those workers who assist others in a specific task. Thus, the "tenders to plasterers" classification includes those workers who assist "plasterers."

BOLI's prevailing wage rate books first classified "tenders to plasterers" as general laborers, but, beginning in February 1998, BOLI's rate book assigned the job of "tenders to plasterers" its own separate classification. The prevailing wage book's description of the type of work that would qualify as "tenders to plasterers" did not include assisting in the spraying of fireproofing material.[5] However, in 1997, BOLI generated an internal document that listed "Fire Proofing (Sprayed)" as a type of work and indicated that employees performing that type of work should be classified as "plasterers." Thus, by extension, "tenders to plasterers" included those assisting others in spraying fireproofing material.

Petitioner could not have determined that its workers were properly classified as "tenders to plasterers" by reference to BOLI's prevailing wage book alone; the correct classification could be determined only by reading the wage book in conjunction with BOLI's nonpublished internal document. Nevertheless, the prevailing wage book instructed employers who were uncertain about proper classifications to contact BOLI's prevailing wage unit, and BOLI expected contractors with questions about fireproofing work to do so.

On June 26, 2000, after petitioner's employees were no longer working on the Bend project, Rowand sent petitioner a fax that included the description of "tender to plasterer" in the prevailing wage rate book and BOLI's internal document classifying those engaged in "fireproofing" as "plasterers." Rowand reported his concerns to Raymond Mott, petitioner's district manager, and then filed a complaint with BOLI's prevailing wage rate unit, alleging that petitioner had underpaid its employees on the project.

---

[5] As described in the final order's findings, that classification read as follows:

**31. Tenders to Plasterers: Assistants, Painters, Paperhangers, Plasterers, and Stucco Masons**

"Assist painters, paperhangers, plasterers, or stucco masons by performing duties of lesser skill. Duties include supplying or holding materials or tools, and cleaning work area and equipment. Exclude construction or maintenance laborers who do not primarily assist painters, paperhangers, plasterers, or stucco masons."

(Boldface in original.)

After speaking with Rowand, Mott contacted Joe Turi, Pro-Tec's owner, about the proper classification of petitioner's employees. Turi faxed Mott a 1997 letter from a BOLI compliance specialist stating that the correct classification for workers assisting those spraying fireproofing material was "laborer." Petitioner had not seen the 1997 letter before receiving it from Turi and, thus, had not relied on it when deciding the appropriate wage to pay.

Rowand's complaint was assigned to Kathleen Johnson, a compliance specialist in BOLI's Portland office, for investigation. On July 11, 2000, Johnson sent a letter to petitioner's Bend branch manager, stating that BOLI had received a complaint that petitioner's employees "may not be receiving overtime or payment at the appropriate job classification wage rate" and requesting all time and payroll records for all employees who performed work on the Bend middle school project from January to April 2000. The letter stated that petitioner's failure to pay its employees the prevailing wage would entitle those employees to payment of back wages and liquidated damages and would expose petitioner to potential civil penalties and debarment for up to three years. The letter noted that "[p]ayment of prevailing wages to workers does not relieve the contractor from any other enforcement action that the Bureau may determine is appropriate."

On July 28, 2000, BOLI filed a "Notice of Claim" against the surety bond on the Bend project to ensure payment of any back wages owed to petitioner's employees. The notice stated that, although BOLI was still investigating the charges, there had been a

"prima facie determination that the prevailing wage as required by ORS 279.350 in the amount of **$3,442.91** has not been paid, plus **$3,442.91** as liquidated damages pursuant to ORS 279.356 for a total claim of **$6,885.82**."

(Boldface in original.)

Johnson and Mott spoke on the telephone in early August. Mott told Johnson that he believed petitioner's employees had been properly classified as "laborers" based on BOLI's 1997 letter to Pro-Tec. Johnson replied that the wage

classification for that type of work had changed since 1997 and that petitioner's employees were now classified as "tenders to plasterers" instead of "laborers." Johnson informed Mott that petitioner had underpaid its employees on the project by a total of $3,442.91 because of the mistaken classification.

On August 14, Johnson and Mott orally agreed to settle the Notice of Claim. On the same day, Johnson sent a letter to Mott that stated, in part:

> "This is to confirm our telephone conversation on 8/14/00. You will pay $3,442.91 in owed wages. This amount does not include the liquidated damages set out in the Notice of Claim (enclosed).
>
> "These owed wages stem from work performed by Labor Ready employees on the New Middle School Project (Exhibit A of Notice of Claim). The employees were not paid the prevailing wage rate for their classification: Tender to Plasterer, $26.59 per hour."

The next day, petitioner paid the $3,442.91 in back wages.

On November 1, 2000, BOLI issued a "Notice of Intent to Place on List of Ineligibles and to Assess Civil Penalties." That notice alleged that petitioner had intentionally failed to pay $3,442.91 in prevailing wages, had intentionally failed to post the prevailing wage rates in a conspicuous and accessible place at the work site, and had filed inaccurate and/or incomplete certified payroll reports reflecting work performed on the project. As a result of those alleged violations, BOLI sought $44,000 in civil penalties and petitioner's debarment for three years.

Petitioner requested a contested case hearing and raised affirmative defenses of claim preclusion, waiver, and estoppel. Petitioner's basic assertion in support of all three defenses was that it had honestly and reasonably believed that the August 14, 2000, settlement of the notice of claim and its concurrent payment of back wages effected a complete release of any liability pertaining to underpayment of wages on the Bend project and precluded BOLI from seeking any sanctions. BOLI filed a motion for partial summary judgment

against petitioner's affirmative defenses and, on March 28, 2001, the hearing officer granted that motion.

The contested hearing was held over three days in June and August 2001.[6] In October 2001, the hearing officer issued a proposed order, which determined that petitioner had violated the prevailing wage rate laws by (1) failing to post the applicable prevailing wage rates in violation of ORS 279.350(4); (2) paying its workers less than the prevailing wage in violation of ORS 279.350(1); (3) filing nine inaccurate and/or incomplete payroll reports in violation of ORS 279.354 and OAR 839-016-0010; and (4) providing itemized statements of earnings to its employees that contained inaccurate information in violation of OAR 839-020-0012. The proposed order assessed $34,000 in civil penalties, including $2,000 for failure to post, $12,000 for failure to pay the prevailing wage, $18,000 for deficient payroll reporting, and $2,000 for providing inaccurate itemized statements. Finally, the order determined that petitioner's failure to post and pay the prevailing wage was intentional—and, thus, pursuant to ORS 279.361(1), petitioner should be debarred for three years.

In December 2001, BOLI issued its final order. That order adopted the proposed order's substantive conclusions and its assessment of $34,000 in civil penalties but reduced the period of debarment to one year.

On review, petitioner raises three assignments of error: (1) BOLI erred in imposing the one-year debarment and, specifically, BOLI misconstrued ORS 279.361(1) in determining that petitioner had "intentionally failed" to pay and post the prevailing wage. (2) BOLI's imposition of $2,000 in civil penalties for petitioner's alleged failure to "keep" the prevailing wage posted was based on an erroneous construction of ORS 279.350(4).[7] (3) BOLI erred in rejecting petitioner's estoppel defense to the imposition of any sanctions.

---

[6] At the beginning of the hearing, the hearing officer allowed BOLI to amend its "notice of intent" to include an additional specification that petitioner had issued incomplete itemized statements of earnings to its employees.

[7] Petitioner does not assign error to BOLI's determinations with respect to the payroll reports and itemized statements or to the imposition of civil penalties for those violations.

■ We begin with petitioner's third assignment of error because, unlike petitioner's other two assignments, which challenge the propriety of specific sanctions, a successful estoppel defense would preclude the imposition of *any* sanction and, ultimately, compel outright dismissal. The gravamen of petitioner's estoppel defense, which is based on Johnson's alleged representations to Mott, is that

> "Labor Ready understood that its payment of $3,442.91 was in complete and final resolution of this matter. Had BOLI-Portland informed Respondent that the issue had not been resolved and that BOLI would thereafter seek additional civil penalties and placement on the list of ineligibles, Labor Ready would have fully defended and litigated the issues surrounding the July 28, 2000 claim."

Petitioner argues that the allowance of partial summary judgment against its defense was erroneous because there were, at least, disputed issues of fact as to the content of Johnson's representations to Mott and petitioner's reliance and that, when viewed most favorably to petitioner, those circumstances estopped BOLI from prosecuting any future enforcement action.

We disagree. Even viewing the record most favorably to petitioner, and even assuming, without deciding, that, as a matter of law, estoppel would otherwise be available, partial summary judgment was proper for either of two reasons.

First, petitioner failed to present evidence that Johnson had represented that, if petitioner paid the wages due, BOLI would not seek civil penalties under ORS 279.370(1) or debarment under ORS 279.361(1). Rather, even viewed most favorably to petitioner, the record shows that (1) BOLI's July 28, 2000, notice of claim sought unpaid wages of $3,442.91, "plus $3,442.91 *as liquidated damages* pursuant to ORS 279.356" (emphasis added); (2) in response, Mott told Johnson that petitioner "would not agree to pay the penalties BOLI *had assessed*" (emphasis added); and (3) Johnson replied by agreeing to "drop *the penalties* in exchange for the payment of the primary wages" (emphasis added). In context, Johnson's agreement to "drop the penalties" could refer only to "the penalties BOLI had assessed,"

*i.e.*, the liquidated double damages under ORS 279.356—and BOLI did, in fact, "drop" that aspect of the July 28 claim. Thus, even under Mott's account, Johnson never represented that BOLI would forego other sanctions if circumstances warranted.

Second, and alternatively, petitioner failed to make any showing of cognizable detrimental reliance. As noted, petitioner asserts that, but for the alleged representation and petitioner's consequent reliance, it "would have fully defended and litigated the issues surrounding the July 28, 2000, claim." However, petitioner did not argue before BOLI—and certainly does not contend on review—that it had any even colorable defense to the July 28, 2000, claim. That is, petitioner does not contend that it was not, in fact, liable for payment of the difference between the "laborer" rate and the "tender-to-plasterer" rate that it was legally obligated to pay under ORS 279.350(1). Given that fact, petitioner did not suffer any legally cognizable detriment from its alleged reliance on Johnson's representation by settling, instead of litigating, a claim that it was legally obligated to pay.

■ We turn then from the general to the specific—to the propriety of imposing particular sanctions. We begin with BOLI's imposition of the one-year debarment under ORS 279.361(1). Petitioner challenges that sanction, arguing that BOLI's determination that it had "intentionally" failed to pay and post the prevailing wage in violation of ORS 279.361(1) was based on an erroneous interpretation of the meaning of "intentionally" as used in that statute.

ORS 279.361(1) provides, in part:

"When the Commissioner of the Bureau of Labor and Industries * * * determines that a contractor or subcontractor has *intentionally failed or refused to pay the prevailing rate of wage* to workers employed upon public works * * * or a contractor or subcontractor has *intentionally failed or refused to post the prevailing wage rates* as required by ORS 279.350(4), the contractor, subcontractor or any firm, corporation, partnership or association in which the contractor or subcontractor has a financial interest shall be ineligible for a period not to exceed three years from the date of publication of the name of the contractor or subcontractor on

the ineligible list as provided in this section to receive any contract or subcontract for public works."

(Emphasis added.)

After concluding that petitioner had failed to pay and post the prevailing wage in violation of ORS 279.350(1) and (4),[8] BOLI's final order addressed whether either of those failures was "intentional":

"In the context of a prevailing wage rate debarment, this forum considers 'intentional' as being synonymous with 'willful.' *In the Matter of Loren Malcolm,* 6 BOLI 1, 9-10 (1986). In *Malcolm,* the forum also adopted the Oregon Supreme Court's interpretation of 'willful' set out in *Sabin v. Willamette Western Corporation,* 276 Or 1083 (1976). 'Willful,' the court said, 'amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent.' *Id.* at 1093. In its closing argument, [respondent] argued for a different standard of liability, contending that Respondent's subjective motivation, as determined by its conduct, should be considered as an element in determining whether a violation is 'intentional.' [Respondent] further argued that *Sabin* should be distinguished from this and other prevailing wage rate cases because it dealt with penalty wages, not a three-year debarment, which is a higher and greater penalty than penalty wages. The forum rejects this invitation to abandon its long-standing reliance on the *Sabin* standard.

"In this case, [respondent] knew it had not posted the applicable prevailing wage rates on the Project, intended not to post them, and was under no restrictions that would have prevented it from posting the rates. [Respondent] also failed to exercise reasonable diligence in determining the proper classification and pay rate for its workers and thereby acted knowingly in classifying and paying its workers on the Project as laborers instead of tenders to plasterers, a classification that paid $5.00 per hour, including

---

[8] Petitioner does not dispute that it failed to pay the prevailing wage in violation of ORS 279.350(1), only that BOLI erred in determining that it did so intentionally in violation of ORS 279.361(1). However, with respect to failure to "post," petitioner challenges not only BOLI's determination that petitioner had acted intentionally but also its predicate determination that petitioner had failed to "keep" the prevailing wage "posted" in violation of ORS 279.350(4). In the final portion of this opinion, we address the question of whether, albeit un-"intentionally," petitioner violated ORS 279.350(4).

fringe benefits, more than the laborer classification. OAR 839-016-0500."

Based on that interpretation of the statute, BOLI imposed a one-year period of debarment.

■　　　Either intentional failure to pay or intentional failure to post is sufficient to warrant debarment under ORS 279.361(1). Although we begin with BOLI's determination that petitioner "intentionally failed or refused to pay the prevailing rate of wage," much of our analysis will be directly transferable to our discussion of the "intentionally failed or refused to post" provision of ORS 279.361(1).

On review, as before BOLI, petitioner asserts that "intentionally failed," as used in ORS 279.361(1), connotes that the employer knew the applicable prevailing wage in question but, nevertheless, made a conscious decision not to pay that wage. Petitioner asserts that that construction is compelled by the statute's text, as well as by its context and legislative history, which express the legislature's intention to require a heightened degree of culpability before BOLI could impose debarment, the most severe penalty available in the prevailing wage enforcement arsenal.

Conversely, BOLI reiterates the reasoning of its final order: Regardless of whether an employer actually knew of the applicable wage rate, so long as the employer consciously intended to pay the amount that it paid, and that amount was less than the prevailing wage, the employer "intentionally failed" to pay the prevailing wage. Thus, in BOLI's view, an employer's negligent, or even innocently mistaken, failure to pay the correct wage is "intentional," requiring debarment. BOLI suggests that that construction is necessary to address and capture instances of "purposeful ignorance" by employers.

■■　　　In construing the term "intentionally," as used in ORS 279.361(1), we employ the methodology of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We look first to the text of the statute, read in context, as the best indicator of the legislature's intent. *Id.* at 610-11. We may consider legislative history only if the intent

of the legislature is not clear from the text and context inquiry. *Id.* at 611-12.

■ The prevailing wage statutes do not define the term "intentionally," much less "intentionally failed"; however, we typically give words of common usage their "plain, natural, and ordinary meaning." *Id.* at 611. In common usage, "intentionally" means "in an intentional manner: with intention * * *." *Webster's Third New Int'l Dictionary* 1176 (unabridged ed 1993). The root of "intentionally"—"intent"—is defined, in pertinent part, as "the act, fact, or an instance of intending[,]" "the design or purpose to commit any wrongful or criminal act that is the natural and probable consequence of other voluntary acts or conduct[,]" and "the state of mind or mental attitude with which an act is done * * *." *Id.* Although hardly conclusive, those definitions at least suggest that, in using the term "intentionally failed," the legislature intended that an employer cannot be subject to the extreme sanction of debarment under ORS 279.361(1) unless its failure to pay the correct wage is the product of a "design or purpose" or "state of mind or mental attitude."[9]

In that connection, it bears emphasis that ORS 279.361(1) mandates debarment only if the employer "intentionally *failed or refused to pay* the prevailing rate of wage." (Emphasis added.) That is, the statute is phrased not in terms of what the employer intentionally *did* but, instead, in terms of what the employer intentionally *failed* or *refused* to do. As petitioner observes, a party cannot act with "the design or purpose" *not* to do something unless it first knows what the "something" *is*. More concretely: An employer cannot "intentionally fail or refuse" to pay the prevailing wage

---

[9] That construction of "intentionally" comports with the content of "intentional" in a range of other contexts involving culpability for unlawful or injurious conduct. *See, e.g.*, ORS 161.085 (defining "intentionally" or "with intent" for purposes of criminal code statutes as meaning "that a person acts with a conscious objective to cause the result or to engage in the conduct so described); *Babick v. Oregon Arena Corp.*, 333 Or 401, 411-12, 40 P3d 1059 (2002) ("intentional" conduct for purposes of intentional tort liability encompasses not only circumstances in which the actor intends the consequences of his or her act but also those in which the actor knows that those consequences are certain or substantially certain and acts nonetheless); *In re Huffman*, 331 Or 209, 224, 13 P3d 994 (2000) (endorsing and applying as standard of "intentional" misconduct in bar disciplinary proceedings that accused attorney acted with a "conscious objective or purpose to accomplish a particular result").

rate unless it either consciously chooses not to determine that rate or knows what the rate is and then consciously decides not to pay it.

The statutory context corroborates that understanding. As described in our overview of the prevailing wage statutory scheme, *see* 188 Or App at 348-49, enforcement of the requirement to pay the prevailing wage rate is effectuated by a three-tiered penalty structure, with debarment constituting the third and most severe level of sanction. At the first two levels—imposition of liquidated double damages in the amount of unpaid wages under ORS 279.356(1) and imposition of civil penalties under ORS 279.370(1)—sanctions may be imposed based merely on the employer's failure to perform the statutorily prescribed obligation. Neither ORS 279.356(1) nor ORS 279.370(1) refers to, or requires proof of, any culpable mental state, much less intentionality. Thus, for example, an employer's negligent failure to pay the correct prevailing wage, based on mistaken belief as to the prevailing wage rate, is subject to sanctions under those statutes.

In clear contrast, ORS 279.361(1) does include a culpable mental state—"intentionally failed or refused." The legislature's use of that language strongly suggests a conscious choice—an "intention," so to speak—that, given the potentially catastrophic consequences of debarment to firms engaged in public contracting work, that sanction could not be triggered by merely innocent, or even negligent, failure to pay.

BOLI contends, however, that "intentionally" in ORS 279.361(1) is properly contextually construed by reference to judicial decisions interpreting and applying the term "willful" in Oregon's general wage and hour statutory scheme, ORS chapter 652. BOLI particularly invokes *Sabin v. Willamette-Western Corp.*, 276 Or 1083, 1092-93, 557 P2d 1344 (1976), in which the court held that ORS 652.150—which provides that civil penalties shall be assessed by BOLI against an employer who "willfully" fails to pay wages owed to a former employee—imposes liability not only against those employers who knew wages were owed and chose not to pay them, but also against the employer who had a "bona fide belief that he is not obligated to pay" the wages. Thus, under

*Sabin*, the employer was liable for "willful" failure to pay so long as he "knew what he was doing, intended to do what he was doing, and was a free agent." *Id.* at 1094 (internal quotation marks omitted); *see also Vento v. Versatile Logic Systems Corp.*, 167 Or App 272, 3 P3d 176 (2000) (good faith belief that no overtime wages were due does not demonstrate that failure to pay was not "willful").

There are myriad difficulties with BOLI's "contextual" argument. Most obviously (1) that argument depends on importing wholesale a judicial interpretation of a different term from a different statutory scheme; and (2) *Sabin* was decided a year before the legislature enacted ORS 279.361(1) using the term "intentionally," instead of "willfully"—and, presumably, if the legislature had wanted to incorporate *Sabin*'s understanding of "willful" in the later-enacted statute, it would not have used a different term. In all events, those difficulties need not detain us because, even if we accept the premises of BOLI's position, that would, at most, give rise to an ambiguity at *PGE*'s first, "text-in-context" level—and resort to legislative history conclusively confirms petitioner's construction.

ORS 279.361 was enacted in 1977 as part of Senate Bill 297. Or Laws 1977, ch 797, § 6. As originally drafted, the relevant portion of the bill, section 5, provided:

> "Whenever any contractor or subcontractor is found by the Commissioner of the Bureau of Labor to be in violation of ORS 279.350, such contractor or subcontractor * * * shall be ineligible for three years from the date of publication by the Commissioner of the Bureau of Labor of the name or names of said contractor or subcontractor on the ineligible list to receive any public contracts."

Thus, as drafted, the bill required BOLI to debar an employer for three years if the employer was found to have paid its employees on a public works project less than the prevailing wage. There was no intent requirement; the mere act of failing to pay the prevailing wage—even if inadvertent is sufficient to invoke the penalty of debarment.

That putative consequence was the focus of the following colloquy between Senator Wallace Carson, Senator

Dick Groener, and Labor Commissioner Bill Stevenson, in a committee work session:

"[Senator Carson:]   Bill, Section 5, how is that going to operate? * * * [L]et's say I am a contractor or subcontractor, how do you go about finding that I am in violation of 279.350 and how do I go about arguing that I am not so I am not deprived of working on contracts? What is the process? How is it going to work?

"[Commissioner Stevenson:]   I am not absolutely certain as to how it will work. When a contractor, well most times, as it stands now, an individual files a prevailing wage rate claim, alleging not being paid what the law requires, at this point we would have to approach it on the basis of X number claims so when a contractor gets a recurring number of claims * * * 3, 4, 5, whatever it might be, then that contractor would be in line for, considered for, debarment. I am just assuming that would have to be done in some degree of compliance with APA. Obviously there needs to be some rule making involved in this particular statute. * * *.

"[Senator Carson:]   Well, that's a straight-forward good answer. I think it seems to me that a quicker way, and I guess that is what I'm trying to put in my own mind, is that now you have a process for determining violations of ORS 279.350, I presume, and I think what's intended under section 5 is that it is automatic if I as a contractor fail to pay the prevailing wage to anyone. In other words, if I am found in violation of ORS 279.350, I am fearful that section 5 clicks in and failing to pay one locks me for three years, or whatever the period * * * for three years from the time. Now what I'm suggesting, I guess, I just need a little help, I'm trying to decide whether it is in fact automatic so that my appeal route would be on your determination that I wasn't paying the hourly wage and this would be an added penalty; it would not be a separate finding, it would be just automatic that would follow from your finding under 279.350 in addition to paying the back wages, which I think is one of the requirements that you can order, automatically, I'm unqualified for three years. If that, that has some implications and some goods and bads. But, I'd like to know how its going to work. Would you give it some thought and give a recommendation how you'd like to see the thing work?

"[Commissioner Stevenson:] Yes, I recognize that this is fairly abbreviated language here and there needs to be a verification that the contractor, sub, there really is, okay, is one that would warrant debarment. I wouldn't want it to be an arbitrary * * * and you may want to add some language that would clarify the conditions under which that would happen.

"[Senator Carson:] Let me give you an example of where I think my head is and then you can work around it and decide where your head wants to be on the thing. *If it's automatic, I feel that's harsh. Because it might be a negligent or unwillful failure to pay, a misunderstanding of what the prevailing wage is and I think that is not uncommon, frankly, with all the problems you're talking about if, you know * * * if its an automatic then that's a pretty heavy burden to pay for a subcontractor to be wiped out from any public project because of an innocent or negligent failure to pay.*

"[Senator Groener:] Wally, [if] a general contractor failed to pay, would that affect the subcontractor with prevailing wage? In your opinion?

"[Senator Carson:] I just don't know, Mr. Chairman. I think that would be hard to get that way. I don't think the violation of the contractor could be imputed to the subcontractor but I'm just not that familiar with it. But, you have two routes. *The automatic route, and if it goes automatic that's awful harsh to me frankly.* If it leaves some, and in your testimony you indicated where you saw it operate is when the fella, as a writer of course, I think you used the work 'flaunt,' and if the subcontractor or contractor just consistently over a period of time pays lower and flaunts the law then you make that determination * * * that to me seems fair. But, if it isn't automatic, then the statute ought to speak to what's the criteria that the Commissioner of Labor uses in determining whether you are going to impose that penalty. Because that is a very heavy penalty I would guess, blocking a guy out from public contracts for three years. I think [that] would be a very heavy penalty.

"[Commissioner Stevenson:] I think that is a valid point that the implementation of that section not be arbitrary and there be some. *I recognize that many times an employer will inadvertently make an error and I am not seeking to debar people who fall in that category. I would be happy to work up an amendment that would satisfy that.*"

Tape Recording, Senate Committee on Labor, Consumer and Business Affairs, SB 297, Jan 21, 1977, Tape 2, Side 1 (emphasis added).

That exchange expressed Senator Carson's concern that "automatic" debarment would be unduly harsh, particularly where an employer's failure to pay the prevailing wage was based on an "innocent or negligent" mistake about the proper wage. In response, Commissioner Stevenson reassured Senator Carson that the bill was "not seeking to debar people who fall in that category" and that an amendment to the proposed language to address that concern would be forthcoming. The original language was then amended to add the term "intentionally," with that amendment ultimately enacted as section 6 of Senate Bill 297:

> "(1) When the Commissioner of Labor * * * determines that a contractor or subcontractor has *intentionally failed or refused to pay the prevailing rate of wage* to workers employed upon public works, the contractor [or] subcontractor * * * shall be ineligible for a period not to exceed three years from the date of publication * * * to receive any contract or subcontract for public works."

(Emphasis added.)

■ In sum, the legislative history confirms that a negligent or otherwise inadvertent failure to pay the prevailing wage, while sufficient to require repayment of the back wages and liquidated damages to the employee and to invoke civil penalties, is not sufficient to impose debarment. Rather, before an employer can be debarred under ORS 279.361(1), the employer must have acted "intentionally" as that term is commonly understood. Specifically, with respect to intentional failure to pay the prevailing wage, the employer must either consciously choose not to determine the prevailing wage or know the prevailing wage but consciously choose not to pay it. Here, BOLI found that petitioner was merely mistaken as to the prevailing wage in this case. Thus, petitioner's failure to pay the prevailing wage rate was not an intentional failure to pay and cannot be the basis for debarment under ORS 279.361.

■ We turn then to BOLI's alternative basis for debarment, *viz.*, petitioner's alleged intentional failure to post the

prevailing wage rate. ORS 279.361(1).[10] Although petitioner acknowledges that it did not post *any* rates, it argues that it did not consciously choose not to post the correct rate. Rather, petitioner asserts, it merely relied on the already extant posting of rates in the general contractor's shack on the job site. Relying on the interpretation of "willfully" from *Sabin*, BOLI counters that, because "[e]mployer knew it was not posting, intended not to post, and was not prevented from posting," petitioner "intentionally failed" to post the prevailing wage rate.

The "text-in-context" inquiry with respect to the "intentionally failed or refused to post" language in ORS 279.361(1) tracks our discussion with respect to the intentional failure to pay provision. Assuming, for the same reasons discussed there, that the term "intentionally failed" is ambiguous at *PGE*'s first level, we proceed to legislative history. The posting language in ORS 279.361(1) was not part of the original statute as enacted in 1977; it was added in 1983 as part of Senate Bill 89.[11] Or Laws 1983, ch 710, § 7. In a work session on that portion of the bill, the following exchange took place between Senators William McCoy and Margie Hendriksen:

"[Senator McCoy:] Section 6,[12] could you explain that?

"[Senator Hendriksen:] Yes, that is part of the certified payroll that's been added in here. And there is, I believe, this part is that their supposed * * * or posting the prevailing wage.

"[Senator McCoy:] Okay, posting the prevailing wage rate.

---

[10] As noted, ORS 279.361(1) requires debarment when "a contractor or subcontractor has intentionally failed or refused to post the prevailing wage rates as required by ORS 279.350(4)."

[11] Section 2 of Senate Bill 89 amended ORS 279.350 to include the requirement in subsection (4) that "[e]very contractor or subcontractor engaged on a project for which there is a contract for a public work shall keep the prevailing wage rates for that project posted in a conspicuous and accessible place in or about the project." The meaning of that provision, which is the focus of petitioner's last assignment of error, is addressed below.

[12] The posting language was originally included in section 6 of Senate Bill 89, but ultimately was enacted as part of section 7 in the final bill.

> "[Senator Hendriksen:]  *But it requires that you have to intentionally, it is not a negligent failure to post, but you have to intentionally fail to post.*"

Tape Recording, Senate Committee on Labor, SB 89, May 16, 1983, Tape 134B (emphasis added).

That exchange demonstrates that the legislature did not intend that a negligent or otherwise inadvertent failure to post the prevailing wage would be sufficient to require debarment under ORS 279.361. Again, as with the failure to pay the prevailing wage portion of the statute, the legislature's use of the term "intentionally" expressed its intent that a heightened degree of culpability be proven before an employer could be debarred. BOLI asserts, however, that, even if we conclude as we have that the legislature intended to target an intentional—and not a negligent or inadvertent—failure to post the prevailing wage, petitioner violated the statute because it intentionally failed to post *any* rate at all.

We disagree. Here, petitioner's failure to post the applicable prevailing wage rate was, at worst, negligent, and not "intentional" within the meaning of ORS 279.361(1). That is so for either of two reasons. First, petitioner acted from a good-faith, albeit legally mistaken, belief that the posting in the general contractor's shack obviated any need for petitioner itself to post. *See* 188 Or App at 358-61 (discussing, in contextual conjunction, the requirements of ORS 279.350(4) and ORS 279.361(1)). Thus, there was no conscious choice on petitioner's behalf not to perform a known duty. Second, as noted, petitioner was mistaken as to the correct prevailing wage for its employees' work; thus, it did not know the correct rate and, consequently, did not elect not to post *that* rate.[13]

---

[13] Under BOLI's approach, petitioner would have been liable for debarment even if it had posted the "laborer" rate because that was not the correct rate for its employees' work. That approach would, essentially, treat every situation in which an employer was mistaken as to the correct prevailing wage rate as one in which debarment would be triggered because of "intentional failure" to post. That sort of boot-strapping cannot be reconciled with our analysis of the legislature's intent in including the intentionality requirement in ORS 279.361(1).

In sum, we conclude that petitioner did not intentionally fail either to pay or to post the prevailing wage. BOLI erred in directing that petitioner be debarred for a period of one year pursuant to ORS 279.361(1).

We consider, finally, petitioner's second assignment of error, which challenges BOLI's imposition of civil penalties of $2,000 for petitioner's alleged failure to "keep the prevailing wage rates for that project posted" at the project site. ORS 279.350(4). Petitioner asserts, particularly, that BOLI erroneously interpreted and applied the term "*keep * * * posted*" in ORS 279.350(4). (Emphasis added.)

ORS 279.350(4) provides, in part:

"Every contractor or subcontractor engaged on a project for which there is a contract for a public work *shall keep the prevailing wage rates for that project posted* in a conspicuous and accessible place in or about the project."

(Emphasis added.)

Before BOLI, petitioner argued that ORS 279.350(4) did not require that each contractor and subcontractor independently post the prevailing wage rates for the project, only that those employers "keep" the rates posted. Thus, petitioner asserted, the posting requirement contained in ORS 279.350(4) had been satisfied because someone else had posted the prevailing wage rates for the project in the general contractor's job shack. BOLI rejected that construction, concluding that ORS 279.350(4) requires that "*every contractor* and subcontractor engaged on a project for which there is a contract for public work *must post and keep posted* the prevailing wage rates for the project for the period of time that the contractor or subcontractor is engaged in work on the project." (Emphasis added.) That conclusion was, in turn, based on BOLI's interpretation of the statutory text:

"The text of ORS 279.350(4) mandates that '[e]very contractor or subcontractor * * * shall keep the prevailing wage rates * * * posted * * *.' There is only one way this mandate can be accomplished—someone must actually post the rates. The statute provides that the 'someone' is 'every contractor or subcontractor.' There is nothing in the other provisions of ORS 279.350 that creates an ambiguity in this

language, and nothing in its related statutes in ORS chapter 279 leads to a conclusion that those words are susceptible to more than one interpretation."

On review, petitioner reiterates that, contrary to BOLI's conclusion, ORS 279.350(4) does not require every subcontractor and contractor to independently post the prevailing wage rates. Rather, petitioner asserts, all that the statute requires is that the employers "keep" those rates posted. Petitioner further contends that, because the evidence established that the prevailing wage rates were posted at the work site,[14] and there is no evidence that they did not remain posted during the pendency of the project, the posting requirement of ORS 279.350(4) was satisfied.

■ In assessing the parties' arguments, we again employ the *PGE* methodology. The statute's requirements are addressed to "*every* contractor or subcontractor." (Emphasis added.) The statute does not define "every," but, in common usage, "every" means "being *each individual or part of a class or group* whether definite or indefinite in number without exception." *Webster's Third New Int'l Dictionary* 788 (unabridged ed 1993) (emphasis added). Thus, the requirements of ORS 279.350(4) must be fulfilled by each contractor and subcontractor on an individual basis.

The conduct required of each contractor or subcontractor is to "keep" the prevailing wage rates "posted." "Keep" is defined, pertinently, as to "cause to remain in a given place, situation, or condition: maintain unchanged: hold or preserve in a particular state." *Webster's* at 1235. Thus, petitioner's interpretation of ORS 279.350(4)—that the statute does not require each contractor or subcontractor to independently post the prevailing wages, but only to make sure that

---

[14] As noted in our description of the facts, BOLI found that the prevailing wage rates were posted in the general contractor's job shack at the job site but that there was no evidence indicating *which* specific classification rates were posted. *See* 188 Or App at 350. Petitioner does not challenge that finding. Thus, from this record, it is unclear whether the specific prevailing wage rate at issue in this case—that of "tender to plasterer"—was, in fact, posted at the job site. However, the question of whether the pertinent rate was posted would be material only if we agreed with petitioner that it had no obligation under the statute to itself post the prevailing wage rate. As described below, we reject petitioner's argument in that regard.

the posting is maintained or preserved—is initially plausible. However, the text must be considered in context.

The posting requirement of ORS 279.350(4) was added to the statute in 1983. Or Laws 1983, ch 710, § 2. As already described, *see* 188 Or App at 365 n 11, the same bill also amended ORS 279.361(1) to require debarment of contractors and subcontractors who "intentionally failed or refused to post the prevailing wage rates *as required by ORS 279.350(4).*" (Emphasis added.) Thus, ORS 279.361(1) proceeds from the premise that ORS 279.350(4) requires contractors and subcontractors to *post*—and not merely to maintain the posting of—the prevailing wage. The conjunction of the two concurrently enacted statutes contextually corroborates BOLI's conclusion that ORS 279.350(4) requires every contractor and subcontractor engaged in a public project to personally initially post the prevailing wage and to maintain that posting throughout the course of its employees' work on the project.[15]

We thus conclude that BOLI correctly determined that petitioner had breached its statutory obligation under ORS 279.350(4). Consequently, BOLI did not err in imposing the $2,000 civil penalty for that violation.

Order of debarment pursuant to ORS 279.361(1) reversed; otherwise affirmed.

---

[15] Contrary to petitioner's protestations about superfluous or duplicative filings, requiring "every contractor or subcontractor" to post the prevailing wage rates for its employees promotes the statutory purpose of "assuring compliance by informing employees of the rate of pay they should be receiving." Ex F, House Labor Committee, SB 89, Jun 15, 1983 (accompanying the statement of BOLI representative Paul Tiffany). To be sure, that requirement may generate duplicative postings, but it also precludes the "slip between the cracks" circumstance presented here, where it is uncertain whether the statutorily prescribed information was *ever* posted *by anyone.*